# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| TYLER SMITH AND SHERRI SMITH ) | |
| AS NEXT FRIEND TO TANNER SMITH ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No. 3:10-cv-00845** |
| v. ) | |
| ) | **Judge Trauger** |
| THE PRUDENTIAL INSURANCE ) | |
| COMPANY OF AMERICA ) | |
| ) | |
| **Defendant.** ) | |

## CORRECTED MEMORANDUM[1]

The defendant has filed a Motion for Summary Judgment (Docket No. 37), which the

plaintiffs have opposed in part (Docket No. 63), and the defendant has filed a reply (Docket No.

73).  For the reasons stated herein, the Motion for Summary Judgment will be granted in part and

denied in part.

## BACKGROUND

### I.  Overview

Effective February 1, 2007, Gary Smith ("Smith") took out a life insurance policy with

the defendant, Prudential Insurance Company of America ("Prudential"), which provided for $1

million in natural death benefits and $1 million in accidental death benefits, subject to a two-year

contestability period.  On May 14, 2008, Smith applied for an additional $1 million in natural

---

[1]The only correction in this Memorandum is a citation change on page 24 to read *Boles v. Aluminum Co. Of Am.*, 483 S.W.2d 582, 583 (Tenn. 1972).  The correction has necessitated the renumbering of the footnotes.  The court's previous order on the motion (Docket No. 78) is not affected.

1

death benefits and an additional $1 million in accidental death benefits. The application was approved effective July 1, 2008 and, thereafter, the policy provided a total of $2 million in coverage for natural death and an additional $2 million in the event of accidental death (collectively, the "Policy").[2] Smith named his sons, Tyler Smith ("Tyler") and Tanner Smith ("Tanner"), as beneficiaries under the Policy. The natural death benefit was payable unless Smith died because of suicide within two years of the effective date of the policy, while the accidental death benefit was payable if Smith "sustained an accidental bodily injury . . . [which] directly, and independently of all other causes, resulted in the loss [of life]," except for any loss "from suicide or attempted suicide."

On August 12, 2008, approximately five weeks after the Policy limit increase took effect, Smith was found dead in a hunting stand over 60 miles from his house with a bullet wound through his chest and the rifle from which it was fired laying on the ground 20 feet below him. Prudential, believing that Smith had committed suicide, refused to pay the Plaintiffs under the Policy. Tyler and Smith's wife, Sherri Smith ("Sherri")[3] (collectively, the "Plaintiffs"), then filed this lawsuit against Prudential in Tennessee state court. The Plaintiffs alleged (1) that Prudential breached the Policy by refusing to pay Tyler and Tanner the natural death benefit and the accidental benefit; and (2) that, in refusing to pay under the Policy, Prudential acted in bad faith in violation of Tenn. Code Ann. § 56-7-105. (Docket No. 1, Ex. A). Prudential removed

_____

[2]Specifically, the Policy reflects insurance coverage pursuant to a group contract issued by Prudential to JP Morgan Chase, as Trustee of the American Institute of Certified Public Accountants Insurance Trust ("AICPA"), GO-14273. The AICPA offers life insurance coverage to its members through the group policy issued by Prudential.

[3]Tyler is a minor; therefore, Sherri has filed suit on his behalf.

the case to this court on diversity grounds.  (Docket No. 1.)

Prudential now moves for summary judgment on both counts.  In response to Prudential's motion, the Plaintiffs have abandoned their statutory bad faith claim but argue that the jury should determine whether Tyler and Tanner are entitled to payment under the Policy. Essentially, the only material fact in dispute is whether Smith committed suicide or died by other means.  The question for the court is whether, based on the existing record, there is a genuine dispute of fact on that issue for the jury to resolve.  For the reasons described herein, the court finds that there is.

## II.      Preliminary Issues Concerning Plaintiffs' Evidence

The parties have filed a substantial volume of information in support of their briefs, including deposition transcripts for eight fact witnesses with numerous attached exhibits (Docket Nos. 43-52);[4] various source documents, including, *inter alia*, field notes, investigatory reports, an autopsy report, chain of custody records, firearms testing reports, and death certificates (*see generally* Docket Nos. 40-42, 66, and 67 and attachments thereto); Plaintiffs' discovery responses (Docket No. 45, Exs. 2 and 3); affidavits on behalf of both sides (Docket No. 39, Exs. 1 and 16; Docket No. 67, Ex. 2); expert reports (Docket No. 66, Exs. 1, 3, and 10 (Plaintiffs'

---

[4]These fact witnesses include Sherri (Docket No. 43 ("Smith Dep. I") and 44 ("Smith Dep. II")); Tyler (Docket No. 45 ("Tyler Dep.")); James Stroud, Smith's former client, business associate, and friend (Docket No. 46 ("Stroud Dep.")); Dr. Adele Lewis, who performed the autopsy of Smith's body and ultimately reported his death as a suicide (Docket No. 47 ("Lewis Dep.")); Steve Scott, an agent for the Tennessee Bureau of Investigation, who conducted firearms testing of the rifle found at the scene of Smith's death (Docket No. 48 ("Scott Dep.")); Melinda Brewer, a former Lawrence County Sheriff's Department investigator who investigated Smith's death (Docket No. 49 ("Brewer Dep.")); Dwight Wiles, Smith's business associate and friend (Docket No. 50-51); and Kris Wiatr, Smith's business associate (Docket No. 52) ("Wiatr Dep.")).

retained experts); Docket No. 53, Ex. 2, Docket No. 54, Ex. 1, Docket No. 55, Ex. 1

(Defendants' retained experts)); and expert deposition transcripts for each expert with associated

exhibits (Docket Nos. 53-57, 70-71). The parties have also filed statements of material fact with

associated responses thereto (Docket Nos. 39, 65, 67, and 72).[5] Prudential argues that several

forms of evidence relied upon by the Plaintiffs in their opposition are improper and should not be

considered in resolving the instant motion. Accordingly, the court must address these concerns

before articulating the background facts appropriate for consideration at this stage.

(A)    Plaintiffs' Material Facts Premised on Testimony from Non-Experts

Prudential argues that many of the "facts" alleged in Plaintiffs' Additional Facts (and

relied upon in Plaintiffs' opposition) are not supported by the record. Broadly, Prudential

objects that certain alleged facts contain characterizations, generalizations, and statements not

contained in the referenced citations, and/or require impermissible and unreasonable inferences

from the underlying evidence. Having reviewed these materials, the court finds that Prudential

---

[5]The Plaintiffs originally filed their statement of Additional Material Facts in Support of Its [sic] Response in Opposition to Defendants' Motion for Summary Judgment with supporting exhibits at Docket No. 66. The Plaintiffs then refiled the same materials with required descriptions of the attached exhibits. (Docket No. 67.) Prudential responded to the Plaintiffs' alleged facts at Docket No. 72. For ease of reference, the court will refer to Docket No. 72 (hereinafter "Plaintiffs' Additional Facts"), which contains the complete statement of Plaintiffs' additional facts with appropriate exhibit descriptions and Prudential's responses thereto.

Also, in support its Statement of Undisputed Material Facts (Docket No. 39), Prudential filed 45 supporting exhibits, which are numbered sequentially pursuant to a "Table of SOF Exhibits" included at Docket No. 39, Attachment 1. Due to the volume of these submissions, Prudential filed the referenced exhibits across Docket Entries 39-42. For consistency with the manner in which Prudential has referenced these exhibits and for clarity of the record, the court will cite to these exhibits as "Prudential SOF Ex. No. [X]," according to the numbered exhibit designation within the "Table of SOF Exhibits" at Docket No. 39, Attachment 1.

has raised valid concerns as to many of the alleged "facts."

For example, the Plaintiffs allege that "Gary Smith placed a number of coyote calls to attract coyotes prior to climbing into the hunting stand, which evidenced his plan to hunt, not kill himself." (Plaintiffs' Additional Facts, Fact No. 13.) The statement is premised on deposition testimony from Sherri, in which she stated that "[m]y understanding is the – a couple of months after the accident, Bret [Fincher] had a cousin, a nephew, some relative, hired help, I'm not sure, who was out on the property cleaning up brush and kind of clearing up the place and found the coyote call that was placed however far away from the actual hut." (Sherri Dep. I at 321:19-25.) Sherri's statement is not premised on personal knowledge, contains hearsay or even double hearsay, and is speculative. Moreover, even if it were true that Smith had placed a coyote call near the hunting stand, whether this alleged fact "evidences" a plan "to hunt, not kill himself" is well beyond the ken of Sherri's knowledge and, regardless, subject to dispute.

Other alleged facts draw unreasonable inferences from the underlying record evidence. For instance, citing to testimony from Sherri and James Stroud (a client, friend, and business associate of Smith), the Plaintiffs allege that "Gary Smith was in good health and had no history of suicidal thoughts." (Plaintiffs' Additional Facts, Fact No. 3.) However, the deposition testimony from Sherri and Stroud does not establish these facts as asserted. Sherri testified that, to her knowledge, the only ongoing medical conditions that Gary had were chronic acid reflux and sinus issues. (Sherri Dep. I at 115:21-116:24.) Stroud testified that he and Smith had spoken periodically about the fact that Smith's father had committed suicide and, in the context of those conversations, Smith had expressed that he could not imagine committing suicide because of its "ripple effect" on families. (Stroud Dep. at 77:1-78:14.) Although it may be fair

5

to infer, in the absence of any evidence to the contrary, that Smith was in relatively good health before his death – for example, he was not suffering from a permanent disability or a terminal illness – it is not reasonable to infer from the cited testimony that Smith had "no history of suicidal thoughts." Of course, what "thoughts" Smith had, only he would have known. At most, it is reasonable to infer from the referenced citations that Smith did not express to Sherri or Stroud any intention to commit suicide.

Finally, a number of facts cite to an Affidavit of Sherri Smith (Docket No. 66, Ex. 2) filed in support of the Plaintiffs' opposition. In that affidavit, Sherri makes four questionable assertions:

> "(3)    On August 12, 2008, Gary Smith had two guns located in his car.
>
> (4)    Once arriving at Brett Fincher's property, Gary Smith changed into hunting clothes as his work clothes were left neatly folded in the house.
>
> (5)    Gary Smith had to walk approximately 0.2 miles through heavy brush to the hunting stand.
>
> . . .
>
> (7)    Gary Smith had not exhibited any signs of being depressed."

*Id.* Sherri does not attest to having personal knowledge of these alleged facts; nor, for that matter, does she articulate any basis for them. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated.") With respect to the facts contained within Paragraphs 3, 4, and 5, the asserted facts lack foundation and, for purposes of this motion, the court will not assume them to be true as stated. However,

6

the record does establish that the hunting stand was likely located at least a few hundred feet away from Fincher's cabin (Sherri Dep. I. at 223:6-9) and that, at some point between leaving the office and his death, Smith changed into full hunting gear. With respect to Paragraph 7, Sherri's observations of Smith were necessarily limited to personal interactions with him. For purposes of the motion, the court will simply assume that, as the record otherwise indicates, Sherri did not personally observe Smith engage in any outward signs or expressions of depression, at least in her estimation.[6]

Under M.D.Tenn. R. 56.01(b), the Plaintiffs were required to provide a "concise statement of the material facts as to which the [Plaintiffs] conten[d] *there is no genuine issue for trial . . . supported by specific citation to the record*." (emphases added). Because the Plaintiffs did not strictly adhere to the requirements of this rule, the court has had to conduct a fact-by-fact analysis to determine the accuracy of each challenged fact alleged by Plaintiffs, whether that fact is supported by admissible evidence, and, if so, whether there is a genuine dispute concerning that fact for trial. Accordingly, with respect to facts alleged by the Plaintiffs to which Prudential has asserted objections, the court relies only on the admissible fact(s) established by the cited evidence – if any – and draws only *reasonable* inferences in the Plaintiffs' favor, as it must. *See*

_____

[6] As to Paragraph 2 of the affidavit, Prudential objects that Sherri's estimate that the Fincher property is approximately sixty miles from Smith's office is speculative and not the best evidence of its content, noting that, according to the Tennessee Department of Transportation, the locations are 92 miles apart. (Plaintiffs' Additional Facts, Response to Fact No. 6.) For purposes of this motion, the precise distance between Smith's office and the Fincher property is not material. Suffice it to say that Smith had to drive a significant distance from his office to reach the location where he died. As to Paragraph 6, in which Sherri states that, "[t]o the best of my knowledge there was no ammunition clip found in the rifle in Gary Smith's possession on August 12, 2008 as the ammunition clip was still in his hunting bag," that statement is consistent with facts otherwise established by the record. (*See, e.g.*, Brewer Dep. at 175:16-19.)

*Brown*, 583 F.3d at 919.  In some instances, the court has also considered facts established by other portions of the record.  *See* Fed. R. Civ. P. 56(c)(3).

      (B)    <u>Plaintiffs' Material Facts Premised on Unsworn Expert Reports</u>

      The Plaintiffs have filed and, in their opposition, purport to rely upon three expert reports prepared by their retained experts pursuant to Fed. R. Civ. P. 26(a)(2).  In its reply, Prudential objects to consideration of these expert reports on two separate grounds.  First, Prudential argues that the court should not consider unsworn expert reports at the summary judgment stage. Second, Prudential asserts a number of specific objections to the admissibility of these reports and the underlying opinions.

          (i)    <u>Reliance on Unsworn Reports at Summary Judgment</u>

      As a general matter, expert testimony may be introduced in summary judgment proceedings through an affidavit or declaration that satisfies the general requirements for summary judgment affidavits and declarations set forth in Fed. R. Civ. P. 56(c)(4).  *See* 11 James Wm. Moore *et al.*, Moore's Federal Practice § 56.94[4][a] (3d ed. 2011).  Thus, among other requirements, the affidavit or declaration must be a sworn document or declared to be true under penalty of perjury.  *Id.*  Accordingly, unsworn expert reports constitute hearsay and may not be considered at the summary judgment stage.  *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 479-80 (6th Cir. 2008) (finding that district court improperly relied on defendant's unsworn expert reports in rendering summary judgment for defendant); *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006) (excluding unsworn expert report from consideration at summary judgment stage); *Spurlock v. Fox*, No. 3:09-cv-0765, 2010 WL 3807167, at *14-*15 (M.D. Tenn. Sept. 23, 2010) (granting motion to strike plaintiffs' expert witness reports as inadmissible

hearsay); *Bomar v. City of Pontiac*, Civil No. 08-12629, 2010 WL 3245798, at *10 (E.D. Mich. Aug. 17, 2010) (excluding unsworn psychological report from consideration at summary judgment stage). Here, the three experts reports offered by the Plaintiffs are unsworn. Therefore, they do not meet the basic precondition for potential consideration at the summary judgment stage, and the court will not consider these reports in resolving this motion.

        (ii)    <u>Evidentiary Challenges to the Substance of the Opinions</u>

Even if the reports were properly authenticated, the reports and the underlying opinions are subject to all other rules of evidence, including traditional standards for the admissibility of expert testimony. *See* Fed. R. Evid. 702 (2011); *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citing *Daubert v. Merrill Dow Phar.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). Prudential argues that, under applicable evidentiary standards, each report and the underlying opinions should be excluded from evidence.

Understandably, in the context of a page-limited reply brief, Prudential has made its arguments in somewhat conclusory fashion. Moreover, because Prudential's legal arguments were raised in the context of a reply brief, the Plaintiffs have not had an opportunity to respond to the generalized evidentiary challenges to their experts. Because the court will not consider these reports in resolving the motion and finds that, even without reference to these reports and the underlying opinions, there is a genuine dispute of material fact for the jury, the court need not rule on Prudential's objections at this time. However, Prudential appears to have raised some valid concerns regarding the admissibility of opinions from the Plaintiffs' experts that require further explanation and a response from the Plaintiffs. Accordingly, the court will issue a separate order concerning pretrial motions to exclude expert testimony.

9

For purposes of resolving this motion, the court will not consider the Plaintiffs' expert reports or any unsupported and/or inadmissible facts asserted therein.

**III.**    **Factual Background**

     A.    <u>Background Concerning Smith</u>

Smith was an accountant and (non-practicing) lawyer who, broadly speaking, performed financial advising services for his clients, including certain music industry celebrities. Smith lived with his family in Brentwood, Tennessee and worked primarily out of his office in Nashville, Tennessee.

Smith seems to have had a good relationship with his children and a stable and loving relationship with his wife. As of the date of his death, Smith and Sherri were planning a vacation to Italy in September 2008 to celebrate their 20th wedding anniversary. Smith also had two sons: Tyler, who was 11 days short of his 17th birthday when his father died, and Tanner, who was approximately thirteen years old at the time. Smith often played golf with Tyler, who is a competitive golfer. Just days before his death, Smith had caddied for Tyler at a golf tournament in Memphis, Tennessee, which Tyler described as a "fun" and "carefree" experience with his father. (Tyler Dep. at 27:12-24.)

Sherri testified that the only medical conditions affecting Smith of which she was aware were acid reflux and sinus issues. The parties have not cited to any evidence that Smith suffered from any debilitating or terminal conditions. Sherri described Smith as a habitual person and she did not observe any appreciable changes to his daily routine before the date of his death.

Smith was an avid hunter who owned multiple firearms and went on frequent hunting trips, either alone or with his friends and business colleagues. At times, Smith hunted on his

10

friend Brett Fincher's property in Lawrenceburg, Tennessee – where Smith's body ultimately

was found. Smith was experienced with guns and gun safety and, according to his friend Stroud,

"preached the gospel of safe hunting." (Stroud Dep. at 18:25-19:2.)

During his career, Smith established several successful business enterprises, including an

accounting firm that he ran with a partner, Douglas Wiles. In the mid-2000's, Smith, Wiles, and

several other business associates of Smith also engaged in a series of business dealings with a

developer named Ronnie Gilley. In essence, Gilley convinced Smith and his colleagues to

establish and finance a series of real estate development ventures in Alabama and Florida at the

height of the real estate boom. In connection with these ventures, Smith and his colleagues

formed a number of companies and obtained bank financing for the development projects

through a series of multi-million dollar loans. Smith executed certain forms of personal guaranty

for portions of the debt.

All but one of these ventures failed and, between late-2007 and mid-2008 (when Smith

died), the underlying entities began to default on their loan obligations and on their payment

obligations to certain development contractors.[7] Prudential contends that Smith's financial

predicament in August 2008 was dire, particularly given that several large loans for which Smith

had executed forms of personal guaranty had matured or were about to mature, with no

reasonable prospect of repayment. Indeed, at least one of Smith's business partners in these

ventures, Stroud, eventually lost his life savings (several million dollars) and continues to face

---

[7]Kris Wiatr, one of Smith's business partners in the real estate ventures arranged by
Gilley, testified that Gilley was essentially a con man operating a Ponzi scheme. Gilley
eventually pled guilty to federal bribery and corruption charges in connection with a different
development, Country Crossings. *United States v. McGregor*, No. 10-cr-00186-MHT-WC
(M.D. Ala. filed Oct. 1, 2010).

11

multi-million dollar outstanding debt obligations (Stroud Dep. at 36:6-37:3). Prudential suggests that Smith and his family may have suffered the same fate, had he not committed suicide. By contrast, the Plaintiffs contend that Smith's financial situation was not as dire as Prudential suggests.

At any rate, it appears that, as of August 2008, Sherri possessed essentially no knowledge concerning Smith's financial affairs. To her knowledge, nothing about Smith or the family was out of the ordinary. Prudential contends that Smith effectively screened off his family from his private business failures. In sum, Prudential theorizes that, notwithstanding Smith's stable family life and his efforts to maintain an appearance of normality to his family, Smith's financial predicament gave him ample motive to commit suicide by August 2008.

Prudential has also identified other evidence that it contends reflects Smith's intention to arrange his financial affairs for his family's benefit before committing suicide. In May 2007, Smith transferred to Sherri by quitclaim deed his ownership interest in the family's personal residence. Similarly, at some point in 2007, Smith also transferred to Sherri by quitclaim deed his ownership interest in a condominium at the "Wild Heron" development in Panama Beach, Florida, a condominium associated with one of his real estate development ventures. Furthermore, at an unspecified point after Smith took out the Prudential Policy in February 2007, Smith left a ten-page handwritten note for his wife designated "For Your Eyes Only." (Prudential SOF Ex. 42.) The note was in an envelope marked "Sherri - Read Only In Case of My Untimely Death." It states that "[t]his letter is written as a financial guide to you in case of my untimely death. I will try to keep it updated as things change. I plan to live forever but ya never know and I did not want you to not have a plan or a key to our fairly complicated financial

12

situation." It then states that "[t]he good news is we have the following life insurance on me," and lists several life insurance policies, the associated policy limits, and the intended beneficiaries, including the terms of the Policy at issue here.[8] Below that, Smith wrote: "Worth more dead than alive . . . [ellipsis in original] This letter will be near these policies. You should be fine or very good financially as you will have at a minimum $7-$8 million cash, house paid for and little or no debt. Plus, you will have some retirement accounts and equity in some businesses discussed later." The note also details Smith's various real estate investments and provides instructions concerning how to handle them in the event of his death. Towards the end of the letter, Smith states: "I intend on living a long while and wrote this guide just in case the unthinkable happens. Will try to update as things change. Don't incur debt. Get away from Ronnie Gilley. Don't let some new boyfriend steal yours and the kids money. Enjoy life . . . [ellipsis in original] Cremate me as we have talked about . . . If you are reading this everybody will be sad but me and I will be basking in the glory . . . [ellipsis in original] Love forever, Gary." (*See also* Sherri Dep. II. (reciting contents of letter).)

B.    The August 12, 2008 Incident and Immediate Aftermath

On August 12, 2008, the date of Smith's death, Sherri found him to be in an uncharacteristically jovial mood. Before leaving for work, he told her that he planned to go hunting that day, which Sherri did not believe was out of the ordinary. He assembled some of his hunting gear, placed it in a bag, and left the house dressed in his work clothes. He then

---

[8]The note references the Policy limits as $1 million to "Tyler & Tanner Equally," suggesting that the note may have been written before the Policy limits were increased in July 2008. Below the notation concerning the Policy, Smith wrote: "Pays double if accidental death." (*See* Sherri Dep. II at 367:8-13.)

13

returned to the house one or more times that morning, perhaps to retrieve additional hunting gear including a pair of binoculars.  Smith then drove to his office in Nashville.

At the office, Smith's co-workers were planning to throw him a birthday party and had set up a birthday cake in the office break-room.  At an unspecified point before the planned birthday celebration, Smith left the office without telling his secretary[9] and drove to Brett Fincher's property.  Between noon and 1 P.M., Sherri spoke with Smith on the phone multiple times.  During the last of these calls, Smith told Sherri that he was planning to hunt "some varmints" that day, perhaps referring to coyotes or certain small animals.  Also, although Smith typically ate dinner at home alone around 8 P.M., he told Sherri that he would be home in time for dinner with the family around 6 P.M.  Sherri called Smith several times after 1 P.M. but Smith did not answer.

At an unspecified point after arriving at the Fincher property, Smith proceeded at least a few hundred feet into the woods to a hunting stand, which consisted of a small elevated cabin located approximately 20 feet from the ground.  The cabin was accessible by ladder and contained a spring-loaded door that would snap back when released.  At some point between leaving his office and entering the cabin of the hunting stand, Smith changed out of his work clothes and into his hunting gear, including a camouflage shirt.

That afternoon, after Smith had failed to return several phone calls and did not return home for dinner as promised, Sherri contacted Brett Fincher, who in turn asked his father, Charles Fincher, to attempt to locate Smith.  Charles Fincher searched the family property and, at

---

[9]Sherri testified that Smith did not like attention, particularly on his decennial birthday celebrations. (Sherri Dep. I at 206:1-19 ("[H]e just didn't like attention and avoided it.")

some point before 9 P.M, found Smith's body and called 9-1-1.

When authorities responded to the scene, they found Smith's body, dressed in his hunting gear, lying face up with his legs sticking out of the hunting stand doorway. Smith had bullet wounds on his chest and one on his back. The rifle was located on the ground below the hunting stand, its muzzle clogged with dried mud, apparently having fallen from above into mud below the hunting stand. Authorities also found Smith's duffle bag near the ladder, still zipped, containing hunting equipment that included binoculars, a phantom predator call, a "weasel ball" (used for hunting coyotes), an ammunition clip for the rifle, a can of wasp spray, camouflage gloves, face nets, and a hunting knife. (Prudential SOF Ex. 10; Brewer Dep. at 189:14-192:16.)

Among the individuals who responded to the scene was Sergeant Melinda Brewer of the Lawrence County Sheriff's Department ("LCSD"), who reported to LCSD Chief Deputy Terry Beecham. (Brewer Dep. at 12:24-13:2; 30:10-14.) Brewer conducted an initial crime scene investigation. The LCSD initially theorized that Smith had been shot through the back – *i.e.*, that the bullet entered Smith's back and exited through his chest.

That night, Smith's body was taken to a local hospital. Sherri and Brett Fincher went to the hospital, where LCSD officers, at Chief Beecham's direction, gave the rifle, Smith's duffle bag, and all of the bag's contents to Sherri. (Brewer Dep. at 25:20-26:16.) Before these materials were returned to Sherri, no fingerprints were taken from them, nor was any other forensic investigation conducted. Furthermore, the LCSD did not bag Smith's hands, such that any residue on Smith's hands would have been washed off when the body was cleaned. Brewer testified that Chief Beecham refused to permit her to conduct follow-up investigation, such as interviewing witnesses or returning to the crime scene to gather additional evidence. (*See*

15

Brewer Dep. at 26:24-33:16, 32:23-33:2.)

The day after Smith's death, Dr. Adele Lewis, an Assistant State Medical Examiner, performed an autopsy on Smith. She concluded that the wound reflected a close-contact bullet wound that, contrary to the initial assessment by the LCSD, had entered Smith's chest and exited through his back, passing from left to right across Smith's chest horizontal to the ground, straight through Smith's heart and a portion of his spine. On the autopsy report, Lewis listed the death as suicide. (Prudential SOF Ex. 11.) At deposition, Lewis admitted to failing to record several abrasions to Smith's body – the origins of which were not attributed – although she believed they did not affect her original conclusion that Smith had committed suicide. (Lewis Dep. at 168:10-169:25-170:25, 177:3-178:18).

At any rate, when she conducted the autopsy, Lewis was aware that the LCSD was continuing to investigate the circumstances of Smith's death, including the possibility that Smith did not commit suicide. Accordingly, on the initial death certificate, which Lewis was by law required to register within 48 hours of Smith's death, Lewis designated the manner of Smith's death as "pending investigation." (Docket No. 47, Ex. 20; Lewis Dep. at 106:10-16, 196:9-197:1.)

C.      Later Developments in the Smith Investigation

After several months of inactivity on the matter, the Tennessee Bureau of Investigation ("TBI") tested Smith's shirt and determined that the residue on the hole through the shirt reflected a close-contact firearm discharge to the front of the shirt. (Prudential SOF Ex. 14.) There appears to be no dispute that the Browning .308 rifle found at the scene was the firearm from which the bullet that ended Smith's life discharged.

16

While medical examiner Lewis's final report was pending, Brett Fincher contacted her multiple times concerning the progress of her report, at one point insinuating (falsely) that he was working with the LCSD in investigating Smith's death. Lewis did not change or accelerate her findings as a result of Fincher's calls. On February 11, 2009, just after learning the results of the TBI test of Smith's shirt, she filed a "Delayed Report of Diagnosis - Death," which declared that the manner of Smith's death was suicide. (Prudential SOF Ex. 13.) It appears that the registrar registered this document on February 17, 2009. (*Id.*)

After Lewis issued this report, Brett Fincher submitted Smith's rifle to the TBI for testing. A TBI agent tested the rifle but could not get it to discharge unintentionally, even after ramming the butt end of the rifle into the ground multiple times. (Brewer Dep, Ex. 15; Scott Dep. at 29:6-21.) However, the rifle malfunctioned multiple times when the trigger pull performed as if it were blocked, although the agent was eventually able to fire the rifle. (Brewer Dep. Ex. 15.) The agent disassembled the weapon but could not identify the source of the temporary malfunction. *Id.*

At some point, the LCSD theorized that the gun accidentally discharged when Smith used the butt of his (loaded) gun to swat at a wasp's nest located in the outside corner of the hunting house's roof. The LCSD also theorized that the cabin door may have slammed against the butt of the rifle, causing it to discharge. On May 21, 2009, Brewer, at Beecham's direction, closed the case as an accidental death, although she personally believed that "there was no way" that Smith had died accidentally. (Prudential SOF Ex. 9 at p. 6.; Brewer Dep. at 26:19-21, 79:11-20.)

Prudential initiated its own investigation into Smith's death. Based on the results of that extensive investigation, as memorialized in an internal report, Prudential concluded that Smith in

fact committed suicide.  (Prudential SOF Ex. 1 (Affidavit of Victoria A. Angle), at Ex. T;

Prudential SOF Ex. 16 (Affidavit of John Sloth).)

## ANALYSIS

### I.  Summary Judgment Standard

The court must grant a motion for summary judgment if "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a) (2011).  If a moving defendant shows that there is no genuine issue of

material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the

plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that

there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.

2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986).  "In evaluating the evidence, the court must draw all inferences in the light most

favorable to the [plaintiff]."  *Moldowan*, 578 F.3d at 374; *Brown v. United States*, 583 F.3d 916,

919 (6th Cir. 2009).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient," and the plaintiff's proof must be more than "merely colorable."  *Anderson*, 477

U.S. at 249, 252.  An issue of fact is "genuine" only if a reasonable jury could find for the

plaintiff.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita v. Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

18

**II.**     <u>**Standard Applicable to a Life Insurance Contract**</u>.

    A.     <u>The *Prieto* Burden-Shifting Framework</u>

    The parties agree that the Policy is governed by Tennessee law, that the suicide exclusion clauses at issue here are enforceable, and that Tennessee law establishes the burdens of proof. As a starting point, Tennessee recognizes a presumption against suicide. *Elrod v. J.C. Penney Life Ins. Co.*, No. M1999-02195-COA-R3-CV, 2000 WL 798651, at *3 (Tenn. Ct. App. June 22, 2000). This rebuttable presumption was adopted "out of deference to the well known fact that almost universally people love and will defend their lives vigorously, even desperately . . . ." *Id.* (quoting *Provident Life & Accident Ins. Co. v. Prieto*, 83 S.W.2d 251, 259 (Tenn. 1937)). This presumption affects the burdens of proof in the following manner:

    (1) In a suit on an accident policy where the plaintiff can recover only for an accidental death, the affirmative of the issue is on the plaintiff from the beginning to the end of the trial, and the burden of proof in its general sense is on the plaintiff to show an accidental death.

    (2) This burden is met, and a *prima facie* case made out, when the plaintiff has shown a death by external and violent means under circumstances not inconsistent with accident.

    (3) Where a death by external and violent means is shown, and there is no proof as to how it was caused, or the attendant circumstances leave the question doubtful, or the proof concerning them is conflicting or not inconsistent with accident, the law presumes an accidental death, and the burden of proof, in its secondary sense, is cast on the defendant, and requires it to prove by a fair preponderance of the evidence that death was caused by suicide.

    (4) *This presumption is not displaced by proof of circumstances which merely tend in a greater or less [sic] degree to show suicide*, but in such case it is a question for the jury whether they overturn the presumption.

    (5) Where there is no proof indicating either accident or suicide in case of death by external violence, or where the proof is equally balanced, or is conflicting, this presumption comes to the aid of the plaintiff, in making out his or her case.

19

> (6) Where death by external violence is shown by facts or circumstances, inconsistent with accident, the presumption against suicide is displaced, and no longer continues to operate in favor of the plaintiff.

*Prieto*, 83 S.W.2d at 267 (emphasis added); *accord Maddux v. Nat'l Life Ins. & Accident Ins. Co.*, 254 S.W.2d 433, 434 (Tenn. Ct. App. 1953); *Elrod*, 2000 WL 798651, at \*3-\*4.

In applying this burden-shifting analysis, the court must not "shut its eyes to the fact that men, without apparent reason, do commit suicide." *Williams v. Canada Life Assur. Co.*, No. W2000-030960-COA-R3-CV, 2001 WL 846064, at \*7 (Tenn. Ct. App. July 24, 2001) (quoting *Bryan v. Aetna Life Ins. Co.*, 160 S.W.2d 423, 427 (Tenn. Ct. App. 1941)). Accordingly, "where the reasonable probabilities from all the evidence, in the light of reason and common sense, all point to suicide, and are inconsistent with any other theory, the court should not leave the issue of suicide to the jury, but should decide as a matter of law that the insured committed suicide." *Bryan*, 160 S.W.2d at 427; *Maddux*, 254 S.W. 2d at 278; *Littleton v. Provident Life & Accident Ins. Co.*, 489 S.W.2d 41, 42 (Tenn. Ct. App. 1972); *Hines v. Prudential Life Ins.*, 357 F.2d 726, 729 (6th Cir. 1966).

Here, all of the evidence concerning the manner of Smith's death is circumstantial. Accordingly, the court must determine whether, without any direct evidence, Prudential is entitled to summary judgment.[10] The question is necessarily fact-specific. For instance, in

---

[10] In *Bryan*, 160 S.W.2d at 427, the court found that the lower court should not have submitted the issue of accidental death to the jury where, *inter alia*, direct evidence precluded alternative theories of death by the decedent. There, immediately after purchasing a gun, a witness saw the decedent drive his car off the side of a road into a dairy farm. The witness then saw the decedent lift an object, after which the decedent fell out of the witness's view within the car. The witness watched the car and did not see anyone enter the car or exit it. The plaintiff theorized that the decedent had been murdered and the case was tried to a jury, which found for the plaintiff. On appeal, the court found that the evidence was "wholly inconsistent with the theory of murder," particularly where an eyewitness saw no one approach or leave the car at any

20

*Maddux*, the Tennessee Court of Appeals considered whether it was appropriate for the district court to grant summary judgment to the defendant where the case involved purely circumstantial evidence. 254 S.W.2d at 434. The court found that a number of facts and circumstances tended to support the plaintiff's theory that the insured had shot himself to death with a shotgun in his garage by accident, rather than as a result of suicide, including the following:

> "(2) Insured had an exploded gun shell in his pocket when he was killed. No reason is suggested for his having the extra shell in his pocket if he intended to commit suicide.
>
> (3) He was happy in his home life and had no business or financial troubles.
>
> (4) He had been sick for some time, but was getting much better.
>
> (5) He had never given any intimation of suicidal intent.
>
> (6) He may have dropped the gun on the floor of the garage and it exploded. People will drop guns and they will explode when dropped.
> . . .
>
> (8) The shell might have hung in the gun and insured was trying to extricate it and accidentally discharged the gun and killed himself.
>
> (9) The proof shows only one reason for his going to the garage with his gun: to shoot birds. He had done this heretofore. Other reasons, satisfactory to insured, not shown in the proof, might occur to the mind.
>
> (10) There is a presumption against suicide because all men want to live."

*Id.* at 434-35. The court then stated that, "[*i*]*n the absence of direct evidence which shows suicide, we think this case should have gone to the jury*. We cannot know exactly what happened. Mr. Maddux may have intentionally taken his own life. Then again, he may have

_____

point during the period in which the shot was discharged. Accordingly, the court found that, after the close of proof at trial, the trial court should have issued a judgment in favor of the defendant insurer. *Bryan* is distinguishable because this case does not involve direct evidence, such as eyewitness testimony, let alone direct evidence that precludes any alternative theory.

21

been accidentally killed. We do not know. The jury must decide that question." *Id.* at 435 (emphasis added); *see also Elrod*, 2000 WL 798651, at *1-*6 (where death certificate stated that manner of death was "undetermined" but certain circumstantial evidence suggested suicide, issue of manner of death was for the trier of fact to decide); *Hines*, 357 F.2d at 727, 727-730 (affirming jury verdict against defendant insurer and trial court's denial of a directed verdict and judgment notwithstanding the verdict, even where "the circumstances of the decedent's wound give rise to a strong inference that the death was caused by suicide.")

By contrast, in *Littleton*, the Court of Appeals considered whether, after the close of proof at trial, the trial judge properly directed a verdict in favor of the defendant insurance company that the insured had in fact committed suicide. 489 S.W.2d at 41-42. There, the decedent had shot herself to death in her bedroom, with her back on the mattress when the shot was fired. *Id.* at 42. The evidence definitively established that the pistol belonged to the decedent's husband (the plaintiff in the case) and that she had pulled out the gun in unloaded condition, loaded it, and shot herself through the chest while lying on the mattress. *Id.* at 44. The husband theorized that his wife had taken out the gun to check to see if it was loaded, perhaps because of fear of an intruder, and the gun fired accidentally while she checked to see if it was loaded. *Id.* The court found that the plaintiff's theory did not account for evidence demonstrating that she loaded the gun, nor did it explain the location of the wound in her body or why she was lying on the bed when the shot discharged. *Id.* In particular, the court noted that "it is most improbable that a person would hold a gun perpendicular to her chest, while she looks down the barrel to see if it is loaded." *Id.* at 44. Under those circumstances, the court found that a directed verdict was appropriate. *See also Mut. Benefit Health & Accident Ass'n v. Denton*,

124 S.W.2d 278, 284 (Tenn. Ct. App. 1938) (where location of wound precluded a finding that decedent shot himself while cleaning or otherwise working with a gun, there was no reasonable hypothesis for decedent's death but suicide).

      B.      <u>The Impact of the Death Certificate on the *Prieto* Framework</u>

      Under the Tennessee Vital Records Act of 1977 ("VRA"), Tenn. Code Ann. 68-3-101 *et seq.* (2011), "[e]ach certificate provided for in this chapter, filed within six (6) months after the recorded event occurred, shall be *prima facie* evidence of the facts stated in the certificate." *Id.* at § 202(c). The VRA also provides that "[c]ertificates of death registered six (6) months or more after the date of death shall be marked 'delayed.'" *Id.* at § 503(b). Under the VRA, "'[r]egistration' means the acceptance by the office of vital records and the incorporation of vital records provided for in this chapter into its official records." VRA § 102(14).

      Several courts, interpreting what appears to have been a statutory precursor to the VRA, have found that a timely filed death certificate indeed provides admissible *prima facie* evidence of the facts contained therein, although the evidentiary weight of the document is limited. *See Continental Casualty Co. v. Nashville & Am. Trust* Co., 61 S.W.2d 461, 462 (Tenn. 1933) (upholding lower court pre-trial determination not to "correct" public record of decedent's death by supplanting death certificate listing strangulation as manner of death with subsequent coroner's inquest attributing death to external violence or homicide, and upholding determination that trial court should decide admissibility of the subsequent inquest at trial); *Milstead v. Kaylor*, 212 S.W.2d 610, 651 (Tenn. 1948) (stating death certificate raises only "a bare rebuttable presumption which becomes *functus officio* when met with evidence on the subject" and finding that statement in death certificate concerning manner of death, for which

Case 3:10-cv-00845   Document 80   Filed 02/08/12   Page 23 of 29 PageID #: 8991

doctor had performed no investigation and that was "weak and shows grave doubt," did not

constitute a "fact" for purposes of the statute in any case); *Boles v. Aluminum Co. of Am.*, 483

S.W.2d 582, 583 (Tenn. 1972) (applying *Milstead* standard and finding that, where record

contained no evidence regarding cause of death other than death certificate, trial court could find

that the employee died of the cause stated therein).

  Prudential contends that, because medical examiner Lewis's final death certificate

classified Smith's death as a suicide (Prudential SOF Ex. 13), the presumption against suicide is

*per se* displaced and, therefore, the burden shifted to Plaintiffs to affirmatively demonstrate that

Smith did not commit suicide – a burden that Prudential argues Plaintiffs cannot meet.

  First, although the parties have not raised the issue, it appears that the delayed death

certificate was not "registered" within six months of Smith's death, as required under VRA §

202(c).  February 12, 2009 marked six months from the date of Smith's death.  Although Lewis

signed the record on February 11, 2009 – just within the six-month time period – the registrar did

not sign and file the certificate until February 17, 2009 – *after* the six month period.  Thus, the

document does not meet the VRA precondition to qualify as *prima facie* evidence of the facts

stated therein.[11]  Accordingly, the presumption against suicide and the associated *Prieto* burden-

shifting framework still apply.

  Second, even if the certificate did meet the timeliness criteria in VRA § 202(c), the

certificate standing alone does not displace the presumption against suicide.  As *Prieto* and

subsequent decisions, including *Maddux*, *Elrod*, *Denton*, and *Littleton* make clear, the quantum

---

  [11]Nevertheless, the certificate is admissible on other grounds.  *See* Fed. R. Evid. 803(9)
(2011) (exception to rule against hearsay for public record of vital statistics).

of evidence required to displace the presumption against suicide is substantial, requiring that the defendant demonstrate that the insured's death occurred in a manner inconsistent with any theory other than suicide. By contrast, the facts stated in a registered death certificate carry only minimal evidentiary weight, and even the *prima facie* inference dissipates when faced with any contrary evidence. Here, some facts suggest that Smith may not have committed suicide and the jury may hear testimony that controverts and/or undermines the medical examiner's findings. Thus, the court finds that the death certificate, standing alone, does not preclude application of the *Prieto* framework; nor does it independently satisfy Prudential's burden within that framework.

C.    Application

Prudential contends that the circumstantial evidence convincingly demonstrates that Smith committed suicide, to the exclusion of any other theory concerning his manner of death. The following facts, among others, tend to favor Prudential's theory of the case:

- Smith died just five weeks after doubling the limits on the Policy.

- The medical examiner ultimately reported the death as a suicide.

- The TBI and the medical examiner concluded the fatal shot entered Smith's body in the chest and exited through his back.

- The investigating detective believes that "there was no way" that Smith's death was accidental.

- Smith suffered a close contact wound, and the location and direction of the shot – through the heart, horizontal to the ground – strongly suggests a self-inflicted discharge from the rifle.

- The rifle did not accidentally misfire at any point during TBI ballistics testing.

- Smith was an avid and experienced hunter familiar with gun safety, who presumably would have known better than to ram the butt of a loaded rifle into a

25

spring-loaded door or against a wasp's nest with the barrel pointed at his chest.

- Smith was in an uncharacteristically jovial mood the day of the shooting, left the house and returned multiple times, then left work without telling his secretary and without participating in an office birthday party that was planned for him, all of which may reflect odd behavior.

- At some point after taking out the Policy, Smith left a provocative note to his wife that listed his insurance policies, stated that he was "worth more dead than alive," and provided instructions to his wife about how to manage the family's financial affairs in the event of his "untimely" death.

- Smith faced significant debt obligations from his failed business ventures with Gilley, who had essentially conned Smith and his colleagues.

- Smith evidently sought to arrange his assets in a way that absolved Sherri and the rest of his family from liabilities, provided them substantial life insurance payouts in the event his death, and left them an unencumbered home in which to live.

Prudential also suggests that, at Chief Beecham's direction (perhaps because of his relationship to Fincher), the LCSD sought to declare Smith's death accidental regardless of the evidence and to squelch any investigation that might prove otherwise. In support of this theory, Prudential points outs that Beecham ordered Brewer to return material evidence to Sherri the night of the shooting (the rifle, the hunting bag, and all of its contents), prevented Brewer from engaging in certain follow-up investigatory efforts, and made Brewer close the investigation as an "accident" over her objections. As to the crime scene, Prudential suggests that Smith staged the scene to appear like a hunting accident, when in fact it was not. Indeed, at deposition, Brewer acknowledged that, in a previous discussion with Prudential's counsel, she had told him that, "if [Smith's death] was a suicide, it was certainly one of the best staged ones you could imagine." (Brewer Dep. at 142:20-23.) (emphasis added).

In response, the Plaintiffs argue that the circumstantial evidence creates a genuine dispute of fact as to whether Smith committed suicide. The Plaintiffs point out that Smith had a stable

26

family life, a loving and committed relationship to his wife, had participated in an enjoyable vacation with his son shortly before his death, and was planning a 20th wedding anniversary vacation abroad with his wife shortly thereafter. At least with regard to the fact witnesses who testified about their relationships with Smith, it appears that Smith did not express suicidal intent to his friends or family before his death, did not engage in any erratic behavior, and did not exhibit any obvious signs of depression. With respect to events that occurred on the date of his death, it was not atypical for Smith to go hunting on a workday, and Sherri testified that Smith did not like birthday celebrations, providing a plausible explanation as to why he left work despite the planned birthday celebration. Furthermore, Smith promised to return early in time for dinner, which would not have been necessary to say if he planned to commit suicide in the first place.

The Plaintiffs also point out that certain aspects of the location of his death and the crime scene suggest that Smith's death was accidental. For instance, the Plaintiffs point out that Smith drove a significant distance to the Fincher property, changed out of his work clothes into full hunting gear, brought hunting equipment with him including extra ammunition, a phantom predator call and binoculars, and climbed a 20-foot ladder into the hunting stand before the gun discharged, none of which was necessary if Smith intended to take his own life with a single bullet. Furthermore, Brewer confirmed the presence of a wasp's nest at the door of the hunting stand, and the evidence indicates that the hunting stand door was spring-loaded and snapped back after opening, which may be consistent with alternative theories for Smith's death. The Plaintiffs also postulate that the presence of the ammunition clip in Smith's bag indicates that Smith may have believed the gun was not loaded - *i.e.*, that he did not realize that a bullet

27

remained in the chamber even without the ammunition clip. Indeed, Brewer ultimately closed the Smith investigation as an accidental death. The Plaintiffs also contend that Smith's financial situation was not as dire as Prudential asserts and, therefore, did not present overwhelming motivation for him to commit suicide.

Furthermore, as established through relevant deposition testimony, the record concerning Smith's death contains some potentially important gaps. Because the LCSD returned the rifle and zipper bag to Sherri the night of the incident, the ability to retrieve follow-up forensic evidence from those items, such as blood spatter, gunpowder, soot, or other chemical residues, may have been lost. Similarly, because the LCSD failed to bag Smith's hands, the ability to retrieve potentially crucial forensic evidence was also lost. Brewer admitted that the LCSD investigation into Smith's death was incomplete. Similarly, Lewis admitted that she made certain mistakes in her autopsy report and that she based her determination of suicide on a handful of facts gleaned from the autopsy and information provided to her by investigators.[12]

Although it is a close call, the court finds that the true manner of Smith's death is for the jury to decide. Whether Smith in fact had the requisite motivation to take his own life and acted on that motivation, whether medical examiner Lewis made the correct determination concerning the manner of Smith's death, whether Beecham in fact obstructed Brewer's investigation and forced her to close the case as an accident based on implausible theories, and/or whether Smith "staged" his suicide to look like a hunting accident, are matters appropriately for the jury to resolve after consideration of the relevant evidence. Based on the record before the court, a reasonable jury could find that the Plaintiffs have met their low *prima facie* burden to show that

---

[12]The Plaintiffs' opposition does not address Smith's "For Your Eyes Only" letter.

28

Smith died under circumstances not inconsistent with accident.  *See Prieto*, 83 S.W.2d at 267; *Maddux*, 254 S.W. 2d at 278; *Hines,* 357 F.2d at 729.  Even though the evidence is suggestive of suicide, whether the evidence meets the defendant's burden for displacing the presumption against suicide is a matter for the jury.  *Id*.  In sum, the court finds that this case is analogous to *Maddux*, *Elrod*, and *Hines*, in which the courts found that, where there was some circumstantial evidence tending to show that the death may not have been a suicide, the ultimate factual question was for the jury to resolve.  *Littleton* and *Denton*, in which each plaintiff's theory concerning the decedent's death was physically inconsistent with the undisputed evidence, are distinguishable from the facts presented here.

Thus, the court finds that there is a genuine dispute of material fact as to whether the manner of Smith's death falls within the Policy's suicide exception clauses.

## CONCLUSION

Prudential's motion will be granted in part and denied in part.  The Plaintiffs' claims of bad faith under Tenn. Code Ann. § 56-7-105 will be dismissed.  The Plaintiffs' breach of contract claim is reserved for trial.

An appropriate order has entered.

Enter this 8th day of February, 2012.

ALETA A. TRAUGER
United States District Judge

29