TYLER SMITH AND SHERRI SMITH          )
AS NEXT FRIEND TO TANNER SMITH,       )
                                      )
    Plaintiffs,                       )
                                      )          **Case No. 3:10-cv-00845**
v.                                    )          **Judge Trauger**
                                      )
                                      )
PRUDENTIAL INSURANCE                  )
COMPANY OF AMERICA,                   )
                                      )
    Defendant.                        )

## MEMORANDUM

Pursuant to the court's February 2, 2012 Order Regarding Experts (Docket No. 79), the parties have filed evidentiary motions concerning certain experts in advance of trial. The defendant, Prudential Insurance Company of America ("Prudential"), has filed a consolidated Motion *in Limine* and *Daubert* Motion to Exclude, or in the Alternative Limit, the Testimony of William L. Manion, David F. Street, and Thomas M. Price and Request for *Daubert* Hearing (Docket No. 96), to which the plaintiffs have filed a Response in opposition (Docket No. 101), and the defendant has filed a Reply (Docket No. 106). The plaintiffs have filed a Motion *in Limine* Regarding Testimony of Prudential's Witness, Ross Gardner (Docket No. 95), to which the defendant filed a Response in opposition (Docket No. 100).

For the reasons stated herein, Prudential's motion will be granted in part and denied in part, Prudential's request for a *Daubert* hearing will be denied,[1] the plaintiffs' motion will be

---

[1]The plaintiffs did not address Prudential's request for a *Daubert* hearing concerning Prudential's challenges to the plaintiffs' experts.

1

granted, and the court will *sua sponte* exclude certain opinions from defense expert Raulerson.

## BACKGROUND

On August 12, 2008, Gary Smith ("Smith") was found dead in an elevated hunting stand over 60 miles from his home, with a rifle shot through his chest and the rifle from which the shot was fired laying on the ground below the stand. Effective July 1, 2008 (*i.e.*, just five weeks earlier), Smith had doubled his life insurance policy with Prudential, which thereby entitled his children to $4 million upon his death – unless he committed suicide.[2] Before his death, Smith and several business partners had executed substantial personal guarantees for loans to fund multiple real estate ventures, nearly all of which were failing when Smith died. This case turns on one disputed factual issue: did Gary Smith commit suicide on August 12, 2008? (*See* Docket No. 77) If so, his children (the plaintiffs) are not entitled to the policy's death benefits.

In support of their position that Smith did not commit suicide, the plaintiffs retained three experts: (1) forensic pathologist/medical examiner William Manion; (2) psychiatrist David Street; and (3) certified public accountant ("CPA") Thomas Price. In support of its position that Smith committed suicide, Prudential retained three experts: (1) forensic pathologist Tracey Corey; (2) blood spatter/crime reconstruction expert Ross Gardner; and (3) CPA Donald Raulerson.

In a February 2, 2012 Order, the court ordered the parties to file further materials concerning the potential exclusion of testimony by the parties' experts at trial, including expert

---

[2]Smith originally took out an insurance policy with Prudential that, in relevant part, essentially entitled his family to $2 million if he died by accident. Although it does not affect the court's disposition of the pending motions, the court notes that the parties appear to dispute whether Smith or Prudential initiated the discussion about doubling the policy's coverage effective July 2008.

2

statements in compliance with Local Rule 39.01(c)(6)(c), briefing addressing concerns identified by the court relative to the plaintiffs' experts, and affidavits addressing any potential evidentiary gaps. In compliance with that Order, the plaintiffs filed expert statements from Manion (Docket No. 85, Ex. 1 ("Manion Statement")), Street (*id.*, Ex. 2 ("Street Statement")), and Price (*id.*, Ex. 3 ("Price Statement")), and the defendants filed expert statements from Corey (Docket Nos. 86, Ex. 1 ("Corey Statement") and 87 (Exhibits to Corey Statement)), Raulerson (Docket Nos. 88, Ex. 1 ("Raulerson Statement") and 89 (Exhibits to Raulerson Statement)), and Gardner (Docket Nos. 90, Ex. 1 ("Gardner Statement") and 91-92 (Exhibits to Gardner Statement)).

In support of their Memorandum of Law (Docket No. 97), the defendants attached appendices listing specific objections to particular pages and lines in the Manion Statement (*id.*, Ex. 1 ("Appendix A")), the Street Statement (*id.*, Ex. 2 ("Appendix B")), and the Price Statement (*id.*, Ex. 3 ("Appendix B")). In support of their Response in Opposition, the plaintiffs filed (1) attached itemized responses to Appendices A-C (*See* Docket No. 101, Attachment Nos. 1-3);[3] (2) eight supporting affidavits (Docket No. 102), including affidavits from each of their retained experts (*id.*, Attachment Nos. 1 (Street), 2 (Price), and 7 (Manion)) and five fact witnesses (*id.*, Attachment Nos. 3, 4, 5, 6, and 8); (3) certain deposition excerpts (Docket No. 103); (4) a law review article relating to psychological autopsies (Docket No. 104); and (5) copies of unpublished cases (Docket No. 105).

--------

[3]The parties have identified the relevant pages and lines by reference to the page number on the court's docket, which does not correspond to the actual page numbering within each expert's statement. For example, Page 1 of the Manion Statement appears at Page *2* of Docket Entry No. 85, Ex. 1, and the parties reference objections to statements on that page as occurring on Page 2. Thus, to correspond to the parties' submissions and for ease of reference, the court will utilize the docket page numbering when referencing particular pages in each statement.

3

**<u>LEGAL STANDARD</u>**

Federal Rule of Evidence 702 provides as follows:

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the Supreme Court identified four non-exclusive factors that may be helpful to the court in assessing the relevance and reliability of expert testimony, including (1) whether a theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Id.* at 593-94.

In its "gate-keeping" role, a trial court must evaluate the relevance and reliability of all expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). That said, the *Daubert* factors do not constitute a "definitive checklist or test." *Id.* at 150. Indeed, the court's fundamental objective is to generally evaluate, based on whatever factors are important to the particular case, the relevancy and reliability of the testimony and not necessarily to explore factors that might not be relevant to a particular case, such as whether the expert's methods are subject to empirical testing. *Id.* at 151. That is, the court is to ensure that the proffered

4

testimony is reliable and relevant and that the expert, whatever his or her field, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

The proponent has the burden of establishing that the pertinent admissibility requirements have been meet by a preponderance of the evidence. Fed. R. Evid. 104; *see also Pride v. Bic Corp.*, 218 F.3d 566, 577-78 (6th Cir. 2000) ("In short, under *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case.") (citing *Daubert*, 509 U.S. at 592 n.10).

## ANALYSIS

### I. William Manion

Manion is physician who is board-certified in anatomic, clinical, and forensic pathology. Based on his expert report (Docket No. 70, Ex. 1, served September 15, 2011) and prior deposition testimony (Docket Nos. 70-71), the court expressed serious reservations about the potential admissibility of Manion's opinions at trial. As an initial matter, the expert report relied on essentially a verbatim recitation of facts provided to Manion in a retention letter from plaintiffs' counsel, many of which did not appear to have record support. Furthermore, it was difficult to ascertain from Manion's report and deposition testimony precisely which opinions he intended to offer at trial. Finally, the court observed that at least some of Manion's opinions were plainly speculative.

In the Manion Statement (Docket No. 85, Ex. 1, filed pursuant to court's February 2,

5

2012 Order Regarding Experts), Manion has, in some respects, substantially pared down the scope of his opinions and removed certain plainly speculative theories of Smith's death, such as a potential homicide theory. Manion now articulates two somewhat overlapping opinions: (1) although the medical examiner, Adele Lewis, classified Smith's death as a suicide, the evidence she considered and/or should have considered was insufficient to support a finding of suicide; and (2) to a reasonable degree of scientific certainty, Smith's death was an accident.

Manion states that, in compliance with generally accepted principles for manner of death determinations, a medical examiner must consider a variety of factors before classifying a decedent's manner of death. Manion contends that Lewis did not comply with these principles in a number of respects (*i.e.*, she violated the standards applicable to a "reasonably competent medical examiner"), chiefly by failing to gather sufficient information. For example, Manion contends that Lewis failed to visit the scene of the incident, did not conduct interviews of Smith's family and friends to determine whether any "factors" existed in Smith's life that may have made him more or less prone to commit suicide, did not account for/investigate the origins of certain additional injuries to Smith's body identified during the autopsy, failed to preserve certain forensic evidence, did not consider a potential defect in the rifle, and unnecessarily assumed that, absent adequate chain of custody and a demonstrated defect in the rifle, Smith's death must have been by suicide. (Manion Statement at pp. 3-7.)

The defendants argue that many of Manion's criticisms are unfair and/or reflect an unreasonable standard. Although the defendants make some valid points,[4] the court finds that

_____

[4]For example, Manion criticizes Lewis for failing to bag Smith's hands to preserve potential residue for further analysis. As the defendants point out, this criticism is unfair, because it appears that law enforcement and/or other medical personnel failed to bag Smith's

6

these criticisms go to the weight of Manion's opinion concerning the adequacy of Lewis's

determination and are appropriate topics for cross-examination. Ultimately, Manion's

admissible opinion that the evidence before Lewis was insufficient to support a finding of

suicide will assist the trier of fact. As the court found in its February 2, 2012 Memorandum

concerning Prudential's Motion for Summary Judgment, Tennessee has a presumption against

suicide and the defendants must overcome that presumption. (*See* Docket No. 77 at pp. 28-29.)

Therefore, expert testimony from Manion that undermines the sufficiency of Lewis's manner of

death determination and/or shows that the evidence is insufficient to support a suicide

determination will assist the jury in assessing whether the presumption against suicide is

overcome with respect to Smith.

  However, the court finds that Manion's opinion that Smith's death was accidental must

be excluded, along with the associated factual recitations and associated analysis. This opinion

presents a host of concerns:

-  <u>Impermissible Testimony Not Expressed in Expert Report</u>: Manion's expert report merely listed certain risk factors identified in an academic article concerning manner of death assessment, but did not apply them to the facts of this case. However, in his Statement, Manion now impermissibly introduces a host of new opinions regarding the application of certain factors to Smith. (*See* Defs.' Reply at p. 8 (accurately listing new opinions).)[5] This testimony was not adequately disclosed and must

_____

hands before Lewis had the chance to perform the autopsy.

 [5]For example, Manion now purports to ascribe significance to, *inter alia*, the lack of a suicide note, the "fact" that Smith did not make any "inappropriate or unexpected preparations for death," and that "[t]here were no events in Gary Smith's life that would constitute significant stress or loss (actual or threatened) that would suggest the manner of death was suicide." (Manion Statement at pp. 8, 10-11.) Even leaving aside the foundational problems with these and other similar representations, these opinions were not disclosed in Manion's expert report in compliance with Rule 26.

7

be excluded pursuant to Rule 37.

- <u>Reliance on Additional Materials Not Relied Upon in Rendering Original Opinion</u>: Manion now purports to rely on Smith's medical records, deposition testimony, and the 10-page letter from Smith to his wife to be read in the event of his "untimely death." However, Manion testified at deposition that he did not review or rely upon these materials in preparing his expert report. It appears that all of these materials were available at the time Manion prepared that report. Therefore, testimony premised on these materials must be excluded pursuant to Rule 37.

- <u>Speculation Concerning Smith's Mental State/Motives</u>: Manion purports to conclude that "[t]he facts and circumstances surrounding Gary Smith's death suggest that he had made no plans to commit suicide." (*Id.* at p. 8.) In support of this conclusion, Manion purports to characterize certain evidence as "inconsistent" with an intent to commit suicide.[6] Even if these new opinions were not already subject to exclusion under Rule 37, the statements are plainly speculative, likely fall outside of Manion's areas of expertise, and amount to no more than *ipse dixit* statements by Manion that are unsupported by a scientific methodology.

- <u>Speculation Concerning Property Transfer and 10-Page Note</u>: Manion purports to characterize Smith's motives for transferring sole ownership of certain property to his wife before he died and for leaving the 10-page note to his wife.[7] Even if this testimony were not excluded as untimely under Rule 37, it is plainly speculative, well outside of the reasonable scope of Manion's professional expertise, and constitutes *ipse dixit* statements unsupported by a scientific methodology.

---

[6]*See, e.g.*, *id.* at pp. 9 ("[A]n ammunition clip for the rifle was found in the bag on the ground below the shooting house . . . . In my expert opinion this fact . . . is inconsistent with Mr. Smith having committed suicide.") and 10-11 ("There were no precautions taken by Gary Smith to avoid rescue . . . . If he was attempting to prevent anyone from finding him or stopping him from committing suicide, his behavior was inconsistent with that intent as he was traveling to a familiar location and letting those close to him know where he would be.")

[7]*See, e.g.*, *id.* at p. 8 ("If there is evidence that Mr. Smith was involved in financial matters that made it in his and his wife's best interest to transfer ownership of the family home to Mrs. Smith, I do not believe that a reasonably competent pathologist/medical examiner would have found this to be evidence supporting suicide.") ("I do not find [the 10-page note] to be an indicator of a person's intent to take his own life [,] particularly if there is evidence that the person was intelligent, well organized, and detail oriented.")

8

- <u>Speculation Concerning Ballistics Evidence</u>: Manion is not a ballistics expert. Nevertheless, for the first time, Manion purports to offer opinions concerning the nature of the rifle that killed Smith and its purported relationship to Smith's manner of death.[8] Again, even if these opinions were not otherwise subject to exclusion as untimely under Rule 37, the opinions fall well outside of Manion's expertise and, at any rate, are plainly speculative.

Accordingly, the court will exclude all of these statements and will exclude Manion's opinion that Smith's death was, to a reasonable degree of scientific certainty, an accident.[9] Furthermore, the court will also exclude several paragraphs of Manion's background section that appear to relate only to this excluded opinion.

Based on these findings, the court will exclude the following testimony:

- Page 2, lines 6-7 (from "and that . . ." to end of sentence);

- Page 2, beginning of third paragraph (beginning "I am advised . . ."), through Page 3, end of third full paragraph (ending ". . . he was deceased.");

- Page 5, line 38 ("and Plaintiff's counsel including witness interviews");

---

[8]*See, e.g.*, *id.* at pp. 9 ("I believe the fact that the ammunition clip was in the [hunting bag found at the scene] and not on the rifle would explain how Mr. Smith may not have been aware that there was a live round of ammunition in the chamber of the rifle.") and 10 ("[A] reasonably competent pathologist/medical examiner . . . would recognize that [,] without the clip, the rifle has the appearance of being unloaded.")

[9]The court also notes that the nature of Manion's opinions concerning the manner of Smith's death have been a moving target. At deposition, Manion testified that "[M]y opinion is much more open than [Lewis's] opinion. She's saying it's a suicide. I'm saying, well, *I don't know*. It could be accident; it could be a homicide for all we know. *So I'm still not sure what it is*." (Docket No. 71, Manion Dep. Vol. II at 264:4-9 (emphasis added).) In his Statement, Manion now purports to opine unequivocally that "the evidence in this case establishes that the manner of Mr. Smith's death is an accident." (Manion Statement at p. 2 (emphasis added); *see also id.* at 8 ("In my opinion a consideration of these pertinent issues involving Gary Smith's history leads to only one reasonable conclusion and that is that Mr. Smith's death was the result of a tragic accident.") (emphasis added).)

- Page 5, line 39 ("and the depositions taken in this matter");

- Page 5, line 40 ("an accident"). Instead of the opinion that the death was "an accident," the plaintiffs may simply restate Manion's admissible opinion that, as stated on Page 2, lines 6-7, "there is insufficient evidence to make a suicide determination," or something to that effect.

- Page 7, lines 25-26 ("may result in an injustice to the family and loved ones of Gary Smith because it");[10]

- Page 8, first full paragraph (beginning "In my opinion . . .") through end of Expert Statement (*i.e.*, end of Page 12), *except* for concluding statement on page 11 that, "[i]n summary [,] it is my opinion within a reasonable degree of medical and professional certainty that there is insufficient evidence to support an opinion that the manner of death of Gary Smith was suicide.")

## II.  <u>David Street</u>

### A.  **Street Statement and Prudential's Objections**

David Street is a board-certified psychiatrist and forensic psychiatrist who currently serves as an Assistant Professor at the Vanderbilt University Medical Center ("VUMC"), where he lectures and provides training on topics including suicide risk assessment. He is also on the Active Medical Staff at the VUMC, serves as a Staff Psychiatrist for Vanderbilt Forensic Services, and serves a psychiatric consultant for the Vanderbilt Faculty and Wellness Program. In the Street Statement (Docket No. 85, Ex. 2, filed on March 2, 2012 pursuant to the court's February 8, 2012 Order Regarding Experts), Street purports to conduct a "psychological autopsy," in which he examined case-related records, interviewed individuals who knew Smith, and performed a site visit in an attempt to recreate the conditions under which Smith died.

The majority of Street's Statement (approximately 30 pages) consists of written

---

[10]The court finds this statement to be extraneous, argumentative, and unduly prejudicial.

Case 3:10-cv-00845   Document 109   Filed 05/31/12   Page 10 of 30 PageID #: 10916

summaries of the interviews Street conducted with six individuals: Sherri Smith (Smith's wife);

Twyla Harrison Lance (Smith's secretary), Gary Bret Fincher (one of Smith's best friends),

Dwight Wiles (Smith's business partner); James Cary Stroud (Smith's friend and former client),

and Clella Ruth Quillen (Smith's mother). These summaries cover various topics, including,

*inter alia*, the interviewees' interactions with and impressions of Smith just before his death,

their personal beliefs as to whether he committed suicide, and their personal beliefs concerning

suicide and the death penalty.

Following the 30+ pages of interview summaries, Street outlines certain potential suicide

risk factors (*e.g.*, male, access to firearms, family history of suicide, unemployment, suicidal

ideation, anxiety disorder) and purports to apply them to Smith. Street also speculates as to the

impetus for Smith's increasing his policy coverage shortly before his death and whether the

conditions at the crime scene were more consistent with accident or suicide.

Based on his consideration of these factors, Street offers a number of sweeping

conclusions regarding Smith's state of mind and whether – based on his psychiatric profile,

crime scene analysis, and consideration of various acts by Smith taken before his death – Smith

*actually* committed suicide on August 12, 2008. For example:

Page 2:    "I have . . . concluded within a reasonable degree of psychiatric
           probability that there is insufficient psychological evidence for a
           reasonably competent pathologist/medical examiner to conclude
           Gary Smith committed suicide. Further based on the totality of my
           analysis, *Mr. Smith did not possess the requisite mental state of
           one who would commit suicide*. As such, I further conclude within
           a reasonable degree of psychiatric probability that *he did not
           commit suicide*."

Page 38:   [discussing July 1, 2008 doubling of insurance coverage]: "While
           there was an increase in coverage amounts, the insurance company
           initiated the insurance policy change, not Mr. Smith. This is a

relevant distinction. Had Gary Smith affirmatively sought the increase in coverage, it would have raised the suspicion that he was planning his death to enrich his family. Rather, it appears the impetus for increasing coverage was a business decision by the insurance company."

Page 39:   "According to Google maps, the ride from Mr. Smith's place of work to the property at which he hunted would take one hour and 42 minutes . . . . Mr. Smith then walked over a tenth of a mile through moderate to heavy brush carrying a bag and rifle . . . . He then climbed to the top of the handmade ladder and entered an awkward narrow doorway and sat down. *This amount of time and effort would be inconsistent with an impulsive act*."

Page 40:   "I state the following conclusion within a reasonable degree of psychiatric certainty: Gary Smith's . . . *psychiatric profile is wholly inconsistent with a person who would commit suicide*. . . . [T]he totality of the circumstances lead to *the inescapable conclusion that Gary Smith did not possess the requisite intent to commit suicide and, **in fact**, did not*."

Page 40:   [discussing circumstances of the crime scene]  "The actual mechanism of death raises some questions. Mr. Smith was right-handed, six foot one inch[es] tall and 230 pounds. He had to walk through moderate to heavy brush for a tenth of a mile with a backpack and rifle and then climb a wet narrow handmade ladder to get inside the tree house. The opening of the tree house was only 22 ½ inches wide. This would appear to be a difficult situation for a right-handed individual of Mr. Smith's size to get a left to right descending gunshot wound. This is all the more intriguing, since Mr. Smith had a handgun in the glove box of his car. *These data do not support a planned or impulsive act, but rather an accidental one*."

Page 41:   "Let us say that he wanted to be found, but he did not want to be saved and he wanted it to look like an accident. There are a few problems with this. First, *I think he could've made a better decision than to use a rifle*. This was a man who everyone described as intelligent. Presumably if he wanted it to look like an accident, he would've taken more steps to remove ambiguity. This is a man who was described as a "smart and creative businessman" *who if he was planning would likely have anticipated this very trial*. The bigger problem I have is motive. *I don't believe he could so perfectly hide all of his stress and emotions from the*

*people closest to him to plan this type of suicide*. The alternative is to believe that he did not have the emotions and stress that would lead to suicide and he was already absent the most commonly associated risk factors for suicide (mood disorder, drug or alcohol use/abuse) and therefore did not plan this elaborate scheme."

Page 41:      "We can't ask Gary Smith what was on his mind at the time of his death. Did he think the gun was unloaded, since the clip was absent? Did he make the classic hunter's mistake? I don't know. *What I do know* is that this is a man that was acting like he did every other day of his life. *I know* that this was a man who appeared happy and successful to those closest to him. He was a man who seemed comfortable with business dealings and unlikely to be shaken by what has been identified as his biggest stressor. *I find that to a reasonable degree of psychiatric certainty Gary Smith's death was just a very sad accident.*"

(Street Statement (emphases added).)   Remarkably, Street also attempted to reconstruct the crime scene, purportedly to assess whether the effort required to reach the hunting stand was consistent with suicidal intent.[11]

The defendants assert a number of objections to Street's opinions, including, *inter alia*,

---

[11]Street states as follows:

I also drove from Nashville down to the property where the incident happened . . . I then hiked about a tenth of a mile to the hunting stand, carrying a rifle and assorted other equipment with me in a bag, out through the field over to the tree house. I climbed through the narrow twenty foot high ladder, crawled through the door, set up in the hunting stand . . . and tried to approximate the position that Gary Smith was found in. I climbed the ladder with the rifle. I opened and secured the door the way Mr. Smith or anyone else would have had to. I handled the rifle in such a way as to approximate the entry and exit wounds found on his body. . . . *One thing I can tell you for sure is that driving all the way down there, hiking through that field and climbing up that ladder was enormously aggravating*, a fact I find significant. From the standpoint of a mental status analysis alone, *that is not the amount of effort one planning to end his life would be expected to endure*.

(Street Statement at pp. 8-9 (emphases added).)

that a psychological autopsy is not admissible under any circumstances, that Street is unqualified to perform one in any case, that Street's methodology is flawed, that Street offers various speculative opinions that are well beyond his expertise, and that Street's Statement contains plainly inadmissible hearsay that is also biased, unreliable, and highly prejudicial.

## B.    Case Law Concerning Psychological Autopsies

It appears that, under certain circumstances, certain courts outside of the Sixth Circuit have found that "psychological autopsies," or at least certain aspects thereof, can meet the *Daubert* standard, typically in cases in which the cause of a confirmed suicide was at issue (*i.e.*, did the manufacturer's drug cause the suicide?),[12] or the manner of death was at issue (*i.e.*, did the decedent commit suicide?).[13]  However, even courts acknowledging the *potential*

---

[12]*See Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308, 313 n.2, 319-320 (D. Vt. 2002); *Giles v. Wyeth*, 500 F. Supp. 2d 1048, 1060 (S.D. Ill. 2007) (noting that "the psychological autopsy is a generally accepted method for trying to determine what led to a suicide," but excluding for, *inter alia*, failure to rely on sufficient information); *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001) (excluding psychological autopsy for lack of reliability, but noting that "these types of post-mortem autopsies appear to be generally accepted"); *In re Neurontin Mktg, Sales Practices, & Prods. Liability Litig.*, MDL No. 1629, Master File No. 04-cv-10981-PBS, 2009 WL 3756328, at *9 (D. Mass. Aug. 14, 2009) (denying motion to exclude psychological autopsy, because, although "[t]his approach will never produce the definitive and testable results expected and demanded in many scientific inquiries[,] it is . . . the generally accepted methodology for analyzing the causes of a *particular* suicide and far from the 'junk science' the *Daubert* and Rule 702 are designed to exclude.") (emphasis added); *Routhier v. Keenan*, No. 04-1359, 2008 WL 5146918, at *5 (Mass. Super. Nov. 12, 2008) (admitting psychological autopsy, where expert relied only on sworn testimony, record evidence, and relevant scientific literature).

[13]*See Fanning v. Sitton Motor Lines, Inc.*, No. 08-cv-2464 CM/DJW, 2010 WL 4261476, at *6-10 (D. Kan. Mar. 10, 2010) (admitting suicidal risk factor analysis component of psychological autopsy, but excluding opinions concerning decedent's actual cause of death); *State v. Guthrie*, 627 N.W.2d 401, 414-420 (S.D. 2001) (applying *Daubert* standard) (finding that it was permissible for expert to testify concerning suicidal risk factors, but impermissible to testify concerning actual manner of death); *United States v. St. Jean*, ACM 29942, 1995 WL 106960, at *2 (A.F. Ct. Crim. App. Feb. 28, 1995) (applying military analogs to Fed. R. Evid.

14

admissibility of psychological autopsies have excluded them in whole or in part. *See, e.g.*, *Fanning*, 2010 WL 4261476, at *6-*10; *Guthrie*, 627 N.W.2d at 419; *Blanchard*, 207 F. Supp. 2d at 319-320, *Cloud*, 198 F. Supp. 2d at 1135.

The parties have also identified one unpublished Sixth Circuit decision, *Halvorsen v. Plato Learning, Inc.*, in which the court affirmed a Magistrate Judge's ruling that the psychological autopsy in question did not meet the *Daubert* standard. 167 Fed. App'x 524, 531, 2006 WL 348163 (6th Cir. 2006) ("*Halvorsen II*").[14] In *Halvorsen I*, Kelly Halvorsen alleged that her husband's former employer had improperly fired him, thereby causing him to commit suicide while driving on a curvy road because of his emotional state. The defendant argued that the death was accidental. In support of her case, Kelly introduced a "psychological autopsy" from Dr. Walker. The report essentially consisted of several paragraphs reciting anecdotal information provided to him by Kelly, followed by a conclusory opinion that, "within a reasonable degree of medical certainty [,] . . . the actions of Plato Learning, Inc. in terminating

---

702-704, limiting testimony regarding psychological autopsy to "the profile of one who is, psychiatrically speaking, suicidal or suicidal risk, and whether the victim exhibited symptoms thereof"); *Herrin v. Treon*, 459 F. Supp. 2d 525, 529-534 (N.D. Tex. 2006) (considering, at summary judgment stage, psychological autopsy generated by prison psychiatrist in ordinary course of business); *but cf. Foster v. Globe Life & Acc. Ins. Co.*, 808 F. Supp. 1281, 1286-87 (N.D. Miss. 1992) (finding that psychological autopsy of decedent was "pure speculation" and "does not nothing to assist the trier of fact in the least," where expert "essentially reiterates plaintiff's emotional responses and conclusions, quoting her repeatedly about her husband's love of life and the mutual love she and the deceased shared.")

[14]Although only briefly addressed in the Sixth Circuit's *Halvorsen II* opinion, the court has located a copy of the expert report and the district court's decision with respect thereto on the trial court's docket. *See Halvorsen, et al. v. PlatoLearning, Inc.*, No. 3:02-cv-00384 (filed July 18, 2002), at Docket No. 47, Ex. 1 (Walker Report) and Docket No. 65 (Memorandum and Opinion). The court will hereinafter refer to the trial court decision as "*Halvorsen I*" and to the Sixth Circuit decision on appeal as "*Halvorsen II*." The parties to *Halvorsen I* had consented to have the Magistrate Judge handle their case.

15

Mr. Halvorsen led to his emotional condition and contributed to the auto accident in which he died." *See Halverson I*, Docket Entry No. 47, Ex. 1. The Magistrate Judge found that Walker was unqualified to render an opinion as to the cause of the accident and that Dr. Walker's reliance on information provided by Kelly and a review of the accident report were "entirely insufficient to render a reliable diagnosis of the emotional condition of a person that Dr. Walker has never met, much less treated." *Halvorsen I*, Docket No. 65 at p. 18.

On appeal, the Sixth Circuit affirmed the lower court's decision. The court observed that Dr. Walker had neither spoken with nor examined Bruce Halvorsen, did not review any of his medical records, relied entirely on anecdotal evidence supplied by Kelly, and admitted that she had never performed a psychological autopsy before. *Halvorsen II*, 167 Fed. App'x at 531. The court also observed that, "[n]o less importantly, Kelly sought to use this testimony to establish an opinion about the *legal* cause of her husband's death." *Id.* (emphasis in original). It found that, "[o]n this record, the magistrate judge did not abuse his considerable discretion in excluding 'what amounted to a legal opinion' from an expert witness." *Id.* (quoting *Stoler v. Penn Cent. Transp. Co.*, 583 F.2d 896, 899) (6th Cir. 1978)).

The court does not interpret *Halvorsen II* as holding that psychological autopsies cannot meet the *Daubert* standard. Instead, *Halverson II* establishes that a psychological autopsy must be issued by an appropriately qualified expert, must be supported by a reasonable methodology that involves a thorough consideration of all relevant evidence bearing on the decedent's state of mind, and must not offer an opinion concerning the legal cause of the decedent's death. Indeed, where the manner of death was at issue, several courts outside of the Sixth Circuit have reached similar conclusions in limiting testimony concerning psychological autopsies. *See Fanning*,

2010 WL 4261476, at *7-*10 (admitting expert testimony concerning "suicidal risk factors" but excluding opinions concerning actual manner of death, where psychological autopsy was expert's first, expert failed to consider plausible alternative explanations for decedent's death, expert relied on assumptions not supported by the evidence, and expert impermissibly concluded that the decedent did not in fact commit suicide); *see also Guthrie*, 627 N.W.2d at 418-19; *St. Jean*, 1995 WL 106960, at *3.

      **C.**     **Application**

            1.    <u>Qualifications and Approach</u>

Street is a highly qualified psychiatrist with experience in evaluating behaviors reflecting suicidal risk. However, Street has never performed a psychological autopsy before and, at deposition, he had difficulty articulating the basis for his methodology. He has since submitted an affidavit stating that his methodology follows practices that are generally accepted within the psychiatric community. Nevertheless, his Statement gives the incorrect impression that the questionnaire he used for interviews is some form of "standardized" document, even though Street has not identified the source of this purported "standard" form, and he has testified that he created the document himself. *See* James Knoll, *The Psychological Autopsy, Part II: Toward a Standard Protocol*, J. Psychiatric Practice, Vol 15, No. 1, at 52 (2009) (stating that there is "[n]o unanimously accepted standardized protocol" for conducting a psychological autopsy). Although the court will not exclude Street's opinion on the basis of his qualifications, Street's methodology appears to be largely *ad hoc*, perhaps reflecting his unfamiliarity with this type of expert analysis and, in particular, how to conduct such an analysis in compliance with *Daubert* admissibility standards.

17

It appears that psychological autopsies, where admitted, may incorporate some consideration of out-of-court statements by individuals who knew the deceased.  *See, e.g.*, *Guthrie*, 627 N.W.2d at 414.  Here, however, Street's reliance on these materials is patently flawed and his presentation of these materials – in 30+ pages of purported "summaries" – implicates a host of evidentiary concerns.

First, the summaries largely constitute inadmissible hearsay: they are unsworn, out-of-court statements largely being offered for the truth of the matter asserted.

Second, the summaries themselves are misleadingly presented.  Although they appear to reflect a "question and answer" format that includes quotes from the interviewees, Street in fact prepared these summaries based on his *notes* from each interview.  (*See, e.g.*, Docket No. 56, Ex. 18 (notes from interview with James Stroud).)  Thus, they necessarily reflect his interpretation and/or recollection of each interviewee's statements and his notes thereof, misleadingly couched in the Street Statement as direct witness quotations.  Furthermore, Street only appears to have followed his alleged "standardized" format with respect to two of the six interviewees.

Third, even taking the summaries at face value, Street appears to have selectively excluded certain details from his summaries – essentially any information that does not support his opinion – and yet presents the information as if it were a complete and accurate account of each interviewee's statements.

Fourth, many of Street's questions elicit testimony from the interviewees on subjects that are irrelevant, beyond the interviewee's personal knowledge, intensely prejudicial, and/or

18

entirely subjective, such as statements concerning their *personal beliefs* as to why Smith died.[15]

Although it is conceivable that, under appropriate circumstances, an expert might rely on some hearsay materials, including interviews, it is plainly inappropriate to present the jury with purported question and answer summaries of those interviews, particularly in the misleading format presented by Street here. Furthermore, the presentation of this substantial volume of hearsay evidence through Street's Statement, much of it involving speculation, irrelevant issues, and/or highly prejudicial material, is improper. Indeed, the plaintiffs have not identified any instance in which a court has admitted a psychological autopsy that so substantially relies on this excessive amount of hearsay material, let alone purports to introduce all of it to the jury through direct testimony at trial.

      3.      <u>Improper Testimony Concerning the Manner of Death and Smith's Actual Mental State</u>

Street also purports to conclude that Smith did not *in fact* commit suicide and that Smith did not *in fact* possess the "requisite mental state" to commit suicide. As *Halvorsen II* makes clear, it is improper for an expert performing a psychological autopsy to offer a conclusion that amounts to a legal opinion regarding the actual manner of a decedent's death. Indeed, as aptly stated in *Guthrie*:

---

[15]*See, e.g.*, Street Statement at p. 11 (to Twyla Lance: "What is your attitude toward death? She stated that she did believe in the death penalty."); p. 15 ("[to Sherri Smith]: What was your belief as to the cause [of Smith's death]? She [Sherri] later believed that it was an accident that occurred while he was climbing up a ladder . . . . She went on to state that another suspicion that had developed since that time was that maybe he was poking a wasps' nest while he was on the []top stair or that he had slipped."); pp. 25-26 (to Bret Fincher: "What is your attitude toward suicide? I think most cases are a cowardly act."); p. 35 (to Clella Quillen: "What is your attitude toward murder? Unless you're protecting your family you should get the hot seat.").

19

> What empirical proof is there that because certain deceased persons in equivocal death cases bore only a few characteristics of a suicidal profile, that therefore they can be declared to have not committed suicide? What studies exist on error rates and falsifiability for such opinions? . . . We think that there is substantial reason to doubt the reliability of suicidal profiles if they are to be used to declare unequivocally that a subject's death was self-inflicted.

*Guthrie*, 627 N.W.2d at 419. Similarly, here, it is improper for Street to testify before the jury as to Smith's actual mental state and intentions on the date of his death, a fact that cannot be known to Street – or, for that matter, anyone other than Smith himself. *See id.* at 415 ("Opinions merely telling a jury what result to reach are impermissible as intrusive, notwithstanding the repeal of the ultimate issue rule.")

> 4.    Speculative Opinions and/or Irrelevant Statements

Street's Statement contains a host of entirely speculative opinions, often on topics plainly outside of his expertise as a psychiatrist. Many of these topics do not even fall within the (potentially) reasonable ambit of a suicidal risk profile.

For example, Street is not qualified to render opinions regarding the nature of the crime scene and how it may have reflected Smith's motivations at the time of his death, yet he purports to conduct an accident reconstruction analysis. Even if he had any background in this area – which he does not – his analysis is unsupported by any scientific methodology; instead, it essentially consists of his personal lay observations about how "aggravating" it was to reach the hunting stand.

Street's musings concerning the pressures that Smith faced from financial difficulties (and how they actually affected Smith) are also entirely speculative, inherently subjective, outside the scope of his psychiatric expertise, and invade the province of the jury. Similarly, Street's analysis of the 10-page letter that Smith left to his wife constitutes pure speculation:

20

without reference to any authority or methodological technique, Street simply states that the note "does not read like a suicide note" and constitutes "an effort to provide his wife with financial information in the event of his death."[16]  (Street Statement at p. 37.)

Furthermore, even if the opinions were not speculative, Street's proposed testimony concerning the nature of the life insurance policy and the parties' positions with respect thereto are irrelevant to his analysis and, regardless, improperly tell the jury what factual inferences to draw from equivocal evidence.

    5.    Discussion Concerning Suicidal Risk Factors

Some of Street's Statement concerns suicidal profile factors and their application to Smith.  According to Street, these include the following "increased risk factors" and "protective factors":

> Factors that are considered to place an individual at risk include the following: suicidal ideation, suicidal intent, plan for suicide, previous suicide attempt(s), family history of suicide, access to firearms, Caucasian, male, elderly or adolescent, widowed/divorced/single, unemployment, substance abuse, hopelessness, mood disorder, anxiety disorder, personality (cluster B) disorder, history of impulsivity/aggression, living alone.  Protective factors include the following: reason for living, positive social support, problem-solving skills, children, religion.

(Street Statement at p. 38.)  Street purports to apply these factors to Smith, largely premised on the hearsay statements of the six individuals he interviewed and/or opinions that must be excluded for the reasons described above.

Some trial courts have found that an expert may present testimony to the jury considering

_____

[16]Street's expert report did not address the letter.  Although the defendants object to Street's analysis of the note on multiple grounds, they do not object on the basis that Street failed to disclose this analysis in compliance with Fed. R. Civ. P. 26.

21

certain suicidal risk factors, to aid the jury in evaluating the decedent's manner of death.  *See,
e.g. Fanning*, 2010 WL 4261476, at *9-*10 ("A qualified expert might testify about the various
factors that make an individual at risk for suicide and about whether the decedent exhibited these
particular characteristics."); *St Jean*, 1995 WL 106960, at *3 (limiting expert to testimony
concerning "the profile of one who is, psychiatrically speaking, suicidal or suicidal risk" and
whether the victim exhibited any such symptoms); *Guthrie*, 627 N.W.2d at 417 ("[A]llowing the
jury the benefit of [the expert's] psychological knowledge and experience on typical
characteristics or profiles of suicidal persons is within the permissible bounds of expert
testimony.  These characteristics give the jury valuable insight into the state of mind of persons
contemplating suicide.")  Thus, under appropriate circumstances, it appears that the court could
admit such testimony.

  Here, however, Street's recitation of and application of the suicidal risk factors lacks
necessary context and a scientific methodology.  With respect to context, Street simply lists the
factors without explaining where they come from, what they mean (to the extent it is not self-
evident)[17], and their relative importance in forming a suicidal profile.  Moreover, Street does not
explain what the presence of all, some, or none of these factors means in evaluating a decedent's
manner of death.[18]  Indeed, Street's Statement improperly suggests that, based on a *post hoc*
suicidal profile, a psychiatrist can *know for a fact* whether an individual possessed the requisite

---

  [17]For example, he never explains what "suicidal ideation" means or how it is typically
manifested, what constitutes a "cluster B" personality disorder, or what it means to have a
"history of impulsivity/aggression" and how that characteristic might manifest itself.

  [18]Street does not even acknowledge that individuals who exhibit few (or none) of the risk
factors may commit suicide or, by the same token, that individuals who exhibit many of the
factors do not.

mental state to commit suicide. Absent the necessary contextual information, Street's unbounded opinions concerning the suicidal risk factors will only confuse the jury and create the misleading impression that the suicidal risk profile is somehow determinative of Smith's manner of death.

Furthermore, Street's application of the suicidal risk factors is largely based on his unscientific *ipse dixit* speculation, the speculation of the individuals he interviewed, and, more generally, his patent over-reliance on the interviewees' statements. (*See, e.g.*, p. 39 ("Mr. Stroud had the same gun [as Smith] in a different caliber and had said, 'I think it . . . is very dangerous . . . When I heard about that gun, I thought, "I bet it was that gun"'.")) In many instances, Street also purports to "apply" particular factors by telling the jury what inferences to draw from equivocal circumstantial evidence. (*See, e.g.*, pp. 38 "[T]here were no written documents found which would have been suggestive of a planned suicide"; and 39 "[Smith] then climbed to the top of the handmade ladder and entered an awkward narrow doorway and sat down. This amount of effort and time would be inconsistent with an impulsive act."; [with respect to the manner of Smith's father's suicide]: "This is completely the opposite of the circumstances under which Gary Smith died.") Moreover, Street's analysis is largely premised on the opinions that must be excluded for the reasons described above.

Thus, Street's presentation and purported application of the suicidal risk factors are devoid of necessary context, methodologically flawed, rely substantially on *ipse dixit* speculation, and would only serve to confuse the jury. Furthermore, the skewed manner in which Street presents his analysis, including his suggestion that a psychological autopsy can be conclusive of a decedent's manner of death, would be unduly prejudicial to Prudential.

23

Thus, although an expert perhaps could present suicidal risk factors to the jury under appropriate circumstances, Street's suicidal risk factor analysis does not meet the *Daubert* admissibility standards.

Accordingly, the court will exclude Street's opinions from trial.

## III.  Thomas Price

### A.    Price Qualifications and Statement

Thomas Price is a certified public accountant who offers opinions that "the pressure of [Smith's] obligations did not present an impossible and permanently devastating situation" and that "the economic impact of the contingent liabilities per Exhibit 4 would not have rendered Mr. Smith or his family in a financially devastated situation from which there was no alternative." (Price Statement at p. 2.)  In his Statement, Price describes Smith's assets and liabilities on the date of his death, including his personal loan guarantees related to the (then-failing) real estate ventures.  Price analyzes Smith's income stream, assesses his actual and potential cash flow as of the date of his death, and examines the past and current status of the loan obligations of Smith and his former business partners.  Price also offers opinions concerning whether Smith could have qualified for Chapter 7 bankruptcy when he died and how filing for bankruptcy might have protected Smith and his family from financial distress.

The defendants object to Price's testimony only in part.  Their main objection is that Price should not be allowed to testify about bankruptcy matters, because those opinions are actually based on the opinions of another expert, bankruptcy attorney John McLemore, who was not disclosed pursuant to Rule 26.  The defendants also argue that the Price Statement improperly addresses events that occurred after Smith's death and that Price improperly offers an

Case 3:10-cv-00845   Document 109   Filed 05/31/12   Page 24 of 30 PageID #: 10930

opinion as to whether Smith's financial situation was sufficient to cause him to commit suicide.

**B.     Application**

1.     <u>Relevance</u>

Regardless of the merits of the Prudential's argument regarding Price's reliance on McLemore, the court finds that Price's opinions and those of the parallel defense expert, Donald Raulerson,[19] are irrelevant in two respects.  Although the plaintiffs have not moved to exclude Raulerson's opinions, the court finds *sua sponte* that Raulerson's opinions on irrelevant issues will be excluded.

First, the Price and Raulerson opinions are irrelevant to the extent they address (a) whether Smith was in fact insolvent on the date of his death, and/or (b) what he *could* have done to protect himself and his family, had he consulted with financial experts.  There is no evidence in the record that Smith actually met with any debt workout specialist or bankruptcy attorney concerning his financial predicament/debt obligations before his death.  Similarly, there is no evidence that Smith measured his financial status (and associated financial predicament) by reference to the Bankruptcy or UCC definitions of insolvency.  Absent such evidence, testimony concerning whether Smith was in fact legally or financially insolvent – or how he could have best managed potential insolvency, had he sought help – is irrelevant to whether he committed suicide and would only confuse the jury.[20]  The court also finds that it would be highly

---

[19]Raulerson offers opinions concerning, *inter alia*, whether Smith was "legally insolvent" under the Bankruptcy Code definition of insolvency and/or "financially insolvent" under the Uniform Commercial Code ("UCC") definition of insolvency.

[20]Even if the testimony from Price concerning bankruptcy issues was relevant, his reliance on McLemore's conclusions is improper.  Price conducted an *interview* of McLemore, in which McLemore provided Price with various conclusions regarding (a) the nature of Smith's

25

prejudicial to the plaintiffs not to exclude similar testimony from Raulerson.

Second, the Price and Raulerson opinions are irrelevant to the extent they address events that occurred after Smith's death.[21]  Both opinions reference the status of the real estate ventures, the states of the associated loans, and/or the current financial status of the other investors following Smith's death.  Whether the real estate deals ultimately were a complete success or a complete failure, and whether Smith's business partners were ultimately able to extricate themselves from these obligations and avoid financial ruin (or not), are not relevant.  What is relevant is Smith's state of mind *on the date of his death*, which of course could not have incorporated information after August 12, 2008.[22]  Again, the court will *sua sponte* exclude similar testimony from Raulerson to avoid jury confusion and undue prejudice to the plaintiffs.

---

[21]assets on the date of his death, (b) whether Smith would have qualified for Chapter 7 bankruptcy, and (c) what the consequences of filing for Chapter 7 bankruptcy would have been.  Although Price now attempts to characterize his discussion with McLemore as merely "confirming" his own opinions, the record demonstrates that Price simply adopted and relied upon McLemore's conclusions in rendering his bankruptcy-related opinions.  McLemore was not retained as an expert in this case, thereby denying the defendants the opportunity to probe McLemore's conclusions at deposition and at trial.

[21]*See, e.g.*, Price Statement at p. 6 ("The joint and several guarantees . . . were 'shared' with three to five other guarantors on total indebtedness of $15,286,322 . . . .  That indebtedness was $12,905,379 as of Mr. Smith's death in 2008.  *That same debt is now, according to the records provided, $6,500,000, which reduces the contingent liability exposure to all guarantors*.") ("[T]he guarantors in those ventures *are in the process of* eliminating their personal liability by paying these creditors a fraction of their real exposure on those guarantees.") (emphases added); Raulerson Statement at ¶¶ 19 ("Currently none of the four borrowers on the mortgage for the Tin Cup condo are making payments.") and 20 ("The [Creekside loan] failed to meet a debt service coverage requirement in December 2008 and fell into default in March 2009").

[22]It is conceivable that some evidence concerning the immediate consequences of Smith's death on the status of the loans and the other investors' obligations will be relevant, to the extent it relates to Smith's potential motive (or lack thereof) to commit suicide.  At any rate, the Price and Raulerson Statements address a host of other plainly irrelevant matters that occurred after Smith's death.

26

### 3.    Additional Inadmissible Opinions

Price and Raulerson both impermissibly offer opinions that exceed the scope of their expertise as CPAs, particularly as to whether the pressure of Smith's debt obligations was sufficiently "stressful" to cause him to commit suicide.[23]  These opinions involve testimony that is irrelevant, speculative, outside the scope of their limited expertise as CPAs, and that invades the province of the jury.  Moreover, with respect to Price, the issue of whether it was "impossible" for Smith to extricate himself from his failing real estate ventures is irrelevant, prejudicial, and potentially confusing to the jury.

### 4.    Admissible Opinions From Financial Experts

Notwithstanding the exclusion of certain opinions by Price and Raulerson, the jury will require expert testimony to explain the import of the large volume of financial documentation regarding Smith's financial status as of the date of his death, particularly as to his income streams and the nature of his interests in the real estate ventures and associated loans.  Testimony on these topics will be limited to explaining the nature of these holdings, not extrapolating into hypothetical scenarios about options Smith might have considered if he did not die in August

---

[23]*See, e.g.*, Price Statement at pp. 2 ("It is my understanding that there is some concern [Smith] *was under enough stress to commit suicide*.  My study of his financial condition . . . lead[s] me to conclude that the pressure of his debt obligations did not present an impossible and permanently devastating situation.") and 3 ("[Smith's] personal financial condition was *not being overly stressed* by additional debt caused by his inability to pay his obligations.") (emphasis added); Raulerson Statement at ¶ 7 ("The question was really whether despite his significant income from his primary job, had Mr. Smith taken on so much debt through these real estate ventures that he was actually insolvent and possibly on the verge of bankruptcy.  After analyzing all of the available data, I ultimately concluded that at the time of his death, Mr. Smith was indeed insolvent.  The significance of the fact that Mr. Smith was insolvent is that *insolvency is an objective indication of financial stress including all of the issues that go with financial stress*, such as how you pay your bills, your standing in the community, and the potential negative effects on your career and business.") (emphases added).

2008, whether Smith was actually insolvent by reference to standards that he was not considering on the date of his death, or what ultimately happened to real estate ventures and associated loan obligations by the other guarantors.

     5.    <u>Specific Findings</u>

Based on these findings, the following testimony will be excluded:

<u>Raulerson Statement</u>:

¶ 7; ¶ 13: from "Since Mr. Smith's death . . ." to end of paragraph; ¶ 16: fourth sentence, from "was abandoned . . .", through end of fifth sentence; eighth sentence: beginning "The actual . . ."; ¶ 17: fifth sentence, from "currently . . ." to end of sentence; ¶ 19: fourth sentence; ¶ 20: second to last sentence (beginning "The loan . . ." and ending " . . . in March 2009."); ¶¶ 27-28; ¶ 29: first sentence; ¶¶ 31-33; ¶ 34: first sentence and third sentence; ¶ 37: third sentence through end of paragraph; ¶ 38: last sentence; ¶ 41: first sentence; ¶ 42: second sentence (only to the extent it incorporates post-August 2008 information) and last two sentences; ¶¶ 48-49: excluded to the extent these paragraphs address excluded portions of Price Statement; ¶ 50: last sentence; ¶ 51.

<u>Price Statement</u>:

| | |
|---|---|
| Page 2: | Within first full paragraph, from "and the history . . ." through end of paragraph; |
| Page 3: | Under "Background" section, phrase "while hunting" within first sentence of second full paragraph; |
| Page 4: | ¶ 15; |
| Page 5: | The fourth sentence within the first full paragraph under "Cash Flow Analysis"; |
| Page 6: | Within first full paragraph, from "Interestingly . . ." through "in question"; |
| | Within third full paragraph, from "which is . . ." through "the total $30,000,000."; |
| | Within fourth full paragraph, the last sentence (beginning "The Same . . ." and ending "guarantors"); |
| | Within fifth full paragraph, clause within first sentence beginning "and |

even" through end of sentence; last three sentences (from "The economy . . . " through ". . . those guarantees."

Pages 6-7:     Entire section entitled "Financial Risk Associated with Guarantees," except for conclusions a., b., e., and g.[24]

Page 7:        Under "Summary - Financial Conditions of Mr. Smith at the time of his death": last sentence within first full paragraph; second full paragraph;

Exhibit 3:     Excluded to the extent it addresses matters after August 2008;

Exhibit 4:     Excluded to the extent it addresses matters after August 2008 (*e.g.*, column reflecting "current loan balance");

Exhibit 6:     Entire exhibit.

## IV.     **Plaintiffs' Motion *in Limine* Regarding Gardner**

Prudential retained expert Ross Gardner to perform an accident reconstruction analysis and bloodstain analysis to assist in determining whether Smith likely died by accident or committed suicide. The plaintiffs challenge only one aspect of Gardner's testimony: at ¶ 23 of Gardner's Expert Statement (Docket No. 90, Ex. 1), Gardner states that "[m]y report was independently peer reviewed by Michael Maloney, a partner at Bevel, Gardner, and Associates [Gardner's firm]." The court will grant the plaintiffs' motion and exclude this statement, which is extraneous and could be interpreted by the jury as reflecting approval by Maloney of Gardner's opinions, even though Maloney will not be appearing at trial.

## V.     **Revisions to Expert Statements**

Consistent with these findings and guidance, the court will order the parties to submit

---

[24]To the extent the plaintiffs continue to regard these conclusions as relevant, they will be permitted to work these conclusions into a revised version of Price's Statement.

revised Expert Statements.[25]  Given the breadth of material that the court has found must be

excluded from the Manion, Price, and Raulerson Statements, the parties are permitted to

reformat the non-excluded portions of their experts' Statements and to revise their exhibits and

numbering accordingly, to ensure that each Statement flows logically for the jury.  Furthermore,

in the interest of fairness, the plaintiffs will be permitted to include a revised (and considerably

narrower) concluding opinion in the Price Statement that does not incorporate his previous

conclusions regarding potential bankruptcy options and events that transpired after Smith's

death.

Any objections to the revised statements should be filed as motions *in limine* by the

deadline set out in the Order Resetting Pretrial Conference and Deadlines entered simultaneously

herewith.  The parties have identified some concerns as to the manner in which their experts'

credentials will be presented to the jury.  This will be discussed at the pretrial conference.

## CONCLUSION

For the reasons expressed herein, Prudential's motion will be granted in part and denied

in part, the plaintiffs' motion will be granted, Prudential's request for a *Daubert* hearing will be

denied, certain testimony from Raulerson will be excluded, and, to the extent necessary, the

parties will submit revised expert statements in compliance with this opinion.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[25]To the extent the court has missed any references to information relating to post-2008
events in the Price and Raulerson Statements that should be excluded, the court expects that the
parties will remove those references voluntarily, in a manner consistent with this opinion.

Case 3:10-cv-00845   Document 109   Filed 05/31/12   Page 30 of 30 PageID #: 10936